UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

97 APR 29 AM 9: 37

U.S. DISTRICT COURT
N.D. OF ALABAMA

SORETTA A. WILLIAMS,               )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )    CIVIL ACTION No. CV-96-S-0677-M
                                   )
TYSON FOODS, INC.,                 )
                                   )
        Defendant.                 )

ENTERED

APR 29 1997

MEMORANDUM OPINION

Plaintiff alleges she was subjected to, and constructively discharged as a result of, sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e *et seq.* The action presently is before the court on defendant's motion for summary judgment, and, motion to strike two affidavits tendered by plaintiff in opposition to the motion for summary judgment. Upon consideration of the motions, pleadings, briefs, and evidentiary submissions, the court concludes that both motions are due to be granted.

## I. MOTION TO STRIKE

Defendant's motion to strike the affidavits of Kelvin Williams and Annie P. Holiday is based on plaintiff's failure to comply with Rule 26(a)(1)(A), Federal Rules of Civil Procedure, and Local Rule 26.1. Rule 26(a)(1)(A) provides:

> (1) Initial Disclosures. Except to the extent otherwise stipulated or directed by order or local rule, a party shall, without awaiting a discovery request, provide to other parties:
>
> (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information....

*29*

Local Rule 26.1 requires that such disclosures be made within 20 days of the parties' planning meeting.

On May 1, 1996, this court entered an order reminding each party of its obligations under Rule 26 and Local Rule 26.1. The Rule 26 planning meeting was held on May 30, 1996. The "Report of Parties' Planning Meeting" provided for the exchange of Rule 26 disclosures by June 19, 1996. Defendant's Rule 26 disclosures were timely provided. (Defendant's Motion to Strike, at ¶ 3.) This court's June 11, 1996 scheduling order required all discovery to be commenced in time to be completed by November 4, 1996. Plaintiff's Rule 26 disclosures were not made until January 21, 1997, more than two months after the discovery cutoff. Consequently, defendant argues:

5. Plaintiff made no Rule 26 filing up to and through the completion of discovery and, not until the date of its required opposition to defendant's motion for summary judgment did plaintiff make her Rule 26(a)(1)(A) disclosure of witnesses which disclosure made the first mention of Kelvin Williams and Annie Holiday as potential witnesses.

6. Wherefore, because of plaintiff's failure to abide by the FRCP, the LR and the Court's order, defendant was deprived of the opportunity to depose Mr. Williams or Ms. Holiday because it was not informed that they were material witnesses to this claim....

(Defendant's "Motion to Strike Affidavits," at ¶¶ 5-6.) For the foregoing reasons, defendant's motion to strike is due to be granted.

## II. FACTS

Defendant, Tyson Foods, Inc., is an Arkansas corporation owning and operating poultry plants in Alabama. On January 31,

2

1994, plaintiff began working at its Heflin, Alabama plant.[1] (Plaintiff's Deposition, at 31.) Plaintiff's aunt, Annie Pearl Holiday, and her husband, Kelvin Williams also were employed there. Plaintiff worked in the packing department, second shift, under the supervision of Ray Umbehent. (*Id.*, at 20-21.)

Plaintiff contends that Umbehent began harassing her in April 1994. (*Id.*, at 36.) Initially, the harassment consisted of plaintiff being summoned to his office for "no apparent reason," other than "to sit ... and talk" to Umbehent.

> Q. Okay. What was the first event that you recall occurring that you considered to be harassment?
>
> A. He would call me in the office -- Ray Umbehent would call me in the office on numerous occasions and for no apparent reason, just want to sit in the office and talk.
>
> Q. Okay.
>
> A. And I asked him why would he pull me off the line doing my job just to pull me in the office to talk about nothing.
>
> Q. What was his response?
>
> A. He told me that he was the boss, to relax and enjoy the break.

(*Id.*, at 36.)

Tyson Foods employees were evaluated on a point system whereby points were subtracted for absences from work. Counseling sessions regarding employee absences were conducted by Umbehent. Umbehent did not take points away from plaintiff, however.

---

[1] At the time of the events giving rise to this action, plaintiff also was employed as a sales clerk at the Wal-Mart store in Oxford, Alabama. (Plaintiff's Deposition, at 14.)

3

> [H]e would never take any points from me. He would just
> call me in the office and write that I was out that
> certain day, and that was it. He would say, "Well, I'm
> not going to take points from you this day." And I told
> him, I said, "Why are you doing that?" I said, "You need
> to take points from me just like you're doing everybody
> else," but he wouldn't.

(*Id.*, at 40.)

During one such session, Umbehent asked plaintiff if she was absent because "it was that time of the month." Plaintiff testified that she did not "take that [comment] in the wrong way." (*Id.,* at 49.) On the other hand, plaintiff was offended during another session when Umbehent asked, "What is the matter, your husband didn't give you any last night." (*Id.*, at 48.) Plaintiff retorted by telling Umbehent that her personal life was none of his business.

On two occasions during counseling sessions, Umbehent walked up behind plaintiff and massaged her shoulders. (*Id.*, at 38, 39.) He also made comments about her legs: "[h]e ... said that I had big legs and that he didn't see anything wrong with my legs, they were just big and pretty." (*Id.*, at 38.)

On June 5, 1996, during an attendance counseling session, Umbehent pushed beyond talk: "[h]e put his hand on my leg and squeezed, and then he took it off when the door opened" and Regina Richey, a co-employee, entered the room. (*Id.*, at 42.)

Plaintiff recalled an additional comment made by Umbehent regarding her personal life when she arrived for work with a "passion mark" on her neck. Plaintiff alleges that Umbehent kept "on and on" about it, saying "somebody tried to eat you up, didn't

4

they?" (*Id.*, at 50.)  Plaintiff testified that Umbehent's comment

caused her embarrassment, because it was made in the presence of

several other employees, who responded with laughter.  Plaintiff

again told Umbehent that her personal life was none of his

business.

    Umbehent also allegedly constantly touched plaintiff while she

sat in the cafeteria.

> I would be sitting in the cafeteria, and he would come
> in.   And the first thing he would do was walk past me
> just so he could hit me on the arm or touch me or just
> put his hand on me somewhere.   And I would be sitting
> with people when he would do this.

(*Id.*, at 54.)  As a result, plaintiff was teased by co-employees.

They would say "he's sweet on you," or "your sugar daddy is looking

for you."   (*Id.*, at 55, 71.)   Despite the offensive conduct,

plaintiff did not complain to Tyson Foods management.

## A.    Plaintiff's Request for Transfer

    Plaintiff's shift (second processing) began at 7:30 a.m. and

concluded at 4:30 p.m.   (*Id.*, at 24.)   Plaintiff's husband worked

as a live hanger on the 6:30 a.m. to 3:30 p.m. (first processing)

shift.    (*Id.*, at 24.)    During the summer of 1994 plaintiff

requested a shift change, but she did not mention Umbehent's

alleged harassment as a basis for her request.    (Lankford

Affidavit, at ¶ 8.)[2]  Instead, plaintiff's stated reason for the

requested transfer was to maintain the same hours as her husband.

(Plaintiff's Deposition, at 23.)  Plaintiff testified that Umbehent

---

[2]Art Lankford is the personnel manager at the Heflin, Alabama, Tyson Foods
plant.

5

became extremely upset over her request for transfer to another shift. (*Id.*, at 25-26.) Even so, plaintiff was moved to the first processing shift, working as an eviscerator. (*Id.*, at 23.)

After three weeks in that position, plaintiff was transferred back to the second processing shift at Umbehent's request. (*Id.*, at 26.) She held the position of "floor person" under his supervision. When plaintiff questioned the transfer, Umbehent responded:

A. He asked me, "Why do you want to be moved to first processing? You can stay back here where you can move up." And I says, "What do you mean?" He says, "Well, if you stay back here, you'll be able to move up quicker than you would be in first processing."

Q. Okay.

A. And I asked him what did he mean by that again, and he says, "You know what I'm talking about." So to get my understanding clear, I called another floor person in there which was under him as a supervisor.

Q. Who was that?

A. Mary....

....

A. I asked her, I says, "Well, Ray is telling me that if I moved to first processing, I couldn't move up." I said, "What kind of job could I move up in back here?" I says, "You got a supervisor job," and I says, "Greg has a supervisor job." I said, "There are no other supervisor jobs." I said, "So what is he talking about?" That's when he come out and tried to play it off like, "Go ahead and tell her she can move up." She looked kind of strange, but then she went ahead and backed him up.

Q. What did she say to back him up?

6

> A.     She just said, "Yeah, you can move up.  There
>        are other jobs you can move up to."  I says, "I
>        just don't see it."

(*Id.*, at 45-46.)  Plaintiff complained about being reassigned to
the second processing shift to Art Lankford, personnel manager at
the Heflin plant.  Significantly, she again did not disclose
Umbehent's alleged harassment.  Thus, Lankford dealt with the
complaint by saying that plaintiff "was still on his payroll and
that he could pull [her] back any time he got ready."  (*Id.*, at
28.)

## B.   Plaintiff's Sexual Harassment Complaint

Plaintiff described the final event leading to her complaint
of sexual harassment as follows:

> [Ray Umbehent] called me over to the cafeteria, and
> everybody could hear him [say], "Come here a minute."  I
> says, "What do you want?" I even told him, I said, "My
> shift hadn't started yet."  I said, "I don't have to do
> anything right now." He said, "Just come here."  I would
> go back there, and he took me into the conference room
> and told me to make him a pot of coffee.

(*Id.*, at 56-57.)  Plaintiff responded by saying, "I'm not your
personal secretary."  (*Id.*, at 57.)  She testified that she could
no longer take Umbehent "pushing [her] around, thinking [she was]
his personal secretary, [and] trying to make [her] do things that
wasn't in [her] job description."  (*Id.*, at 57.)

Plaintiff complained to Bobbie Hammond, the plant nurse.[3]
(*Id.*, at 58.)    Ms. Hammond then informed Art Lankford of
plaintiff's complaints.  (Lankford Affidavit, at ¶ 7.)  Lankford

---

[3]See the discussion of defendant's written sexual harassment policy, at
page 9 *infra.*  The plant nurse is among those persons to whom an aggrieved
employee is directed to complain.

7

immediately suspended Umbehent and began an investigation. (*Id.*) He concluded that, although "these incidents will not be considered sexual harassment in this specific case, this type of behavior is not permissible." (Defendant's Evidence Submitted in Response to Exhibit "D" of the Court's Order: Exhibit C to Wilson Affidavit.)[4] Umbehent accordingly was counseled about his conduct, a letter of reprimand was placed in his personnel file, he was given a three-day suspension, and he was transferred to another shift. (Lankford Affidavit, at ¶ 13.)

Plaintiff had no direct contact with Umbehent following his suspension. Even so, she testified that:

[H]e would come in before my shift was over. I would always see him before I would leave.

. . . .

He didn't say anything to me. He just made sure that I would see him, and he would walk to the door where we were working, and there was a window there. He would stand in that door and just look.

(Plaintiff's Deposition, at 59.)

On October 14, 1994, plaintiff refused to return to work at Tyson Foods.

I just got tired of looking at Ray coming in, doing what he pleased, and nobody was doing anything about him or what he had done. He would come in like he was trying to intimidate me. He would stand there and watch, but he wouldn't never say nothing. He would just stand there and watch. And I just got tired of it.

(*Id.*, at 81.) Four days later, she was terminated for "walk[ing] off the job." (Lankford Affidavit, at ¶ 17.)

_____

[4]Clarence Wilson, Jr., is the Human Resource Manager for the Western Division of Tyson Foods, Inc.

8

On May 18, 1995, Ray Umbehent was fired based on a separate sexual harassment complaint. (Wilson Affidavit, at ¶ 11.)

**C. Tyson Foods' Sexual Harassment Policy**

Plaintiff read, signed, and understood Tyson Foods' policy on sexual harassment. (Plaintiff's Deposition, at 34-35.) That policy provides in part:

> Any team member who believes harassment has taken place by another team member, a supervisor, or agent of the company should promptly report the facts of the incident and the names of the individuals involved to his or her supervisor, the nurse, the plant manager, or the personnel manager. Supervisors are responsible for immediately reporting any incidents within their knowledge to the personnel department.
>
> Investigation of any reported or observed act of harassment will take place immediately, and where found to have occurred, appropriate corrective action will result.
>
> Depending on the seriousness of the offense, or a repetition of prior offense, one of the following disciplinary actions will be taken.
>
> > (1) Written warning for the offending team members [sic] personnel file.
> > (2) Suspension and file record.
> > (3) Transfer and/or demotion.
> > (4) Discharge.

(Wilson Affidavit: Exhibit B.)

### III. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment not only is proper, but "<u>shall be rendered forthwith if</u> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

9

a matter of law. ..." (Emphasis supplied.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *Celotex*, 477 U.S. at 325. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, see *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, see

10

*Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### IV. SEXUAL HARASSMENT

Title VII "prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1981)(citations omitted). Courts recognize two forms of sexual harassment: *quid pro quo* sexual harassment; and, hostile work environment sexual harassment. *Quid pro quo* sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989). Hostile work environment sexual

11

harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Steele,* 867 F.2d at 1315.

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when ... such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

29 C.F.R. § 1604.11(a)(3)(1981).[5]

It is difficult to ascertain from plaintiff's complaint and "Initial Submission in Response to Exhibit D of the Court's Order" whether she alleges a claim for *quid pro quo* sexual harassment, hostile work environment sexual harassment, or both. Therefore, this court will address each form of sexual harassment.

## A.   Quid Pro Quo Sexual Harassment

In a *quid pro quo* case, the corporate defendant is strictly liable for the supervisor's harassment. *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir. 1989)(citing *Henson,* 682 F.2d at 909-10).

> In such a case, the supervisor relies upon his apparent or actual authority to extort sexual consideration from an employee. Therein lies the *quid pro quo.* In that case the supervisor uses the means furnished to him by the employer to accomplish the prohibited purpose. He

_____

[5]In General Electric Co. v. Gilbert, 429 U.S. 125, 97 S.Ct. 401 (1976), the Supreme Court suggested the degree to which courts should defer to the E.E.O.C.'s interpretation of Title VII: "[w]e consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance...." (Citations omitted.)

12

> acts within the scope of his actual or apparent authority
> to "hire, fire, discipline or promote."

*Steele*, 867 F.2d at 1316 (citations omitted).

A plaintiff must prove the following elements to establish a violation of Title VII on the basis of *quid pro quo* sexual harassment: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment complained of was based on sex; (4) the employee's reaction to the harassment complained of affected tangible aspects of the employee's compensation, terms, conditions or privileges of employment, in that the acceptance or rejection of the harassment by the employee is an express or implied condition precedent to receipt of a job benefit, or the cause of a tangible job detriment; and (5) the harassment complained of was inflicted by the employee's supervisor, and the employer therefore is strictly liable. *Henson*, 682 F.2d at 909.

Plaintiff's claim of *quid pro quo* sexual harassment, if such a claim was intended, lacks merit. Plaintiff fails to allege or present any proof that she was subjected to unwelcome harassment in the form of requests for sexual favors, and that her reaction to the alleged harassment affected the compensation, terms, conditions, or privileges of her employment.

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, [or] (2) submission to or rejection of such conduct by an

13

> individual is used as the basis for employment decisions
> affecting such individual....

29 C.F.R. § 1604.11(a)(1) & (2).[6]  "The acceptance or rejection of
the harassment by an employee must be an express or implied
condition to the receipt of a job benefit or the cause of a
tangible job detriment in order to create liability under this
theory of sexual harassment." *Henson*, 682 F.2d at 909 (citing 29
C.F.R. § 1604.11(a)(1) & (2) (1981)).

It is uncontested that the alleged harassment consisted of no
requests for sexual favors. (Plaintiff's Deposition, at 80.)  In
addition, plaintiff has neither alleged nor shown that Umbehent
conditioned any term of her employment on her submission to
unwelcome harassment.  *See Trautvetter v. Quick*, 916 F.2d 1140,
1148 (7th Cir. 1990)(finding no *quid pro quo* where complainant
failed to show that the supervisor's sexual advances infringed in
some manner upon her ability to obtain a promotion or other job
related benefit).  The only incident in which any job benefit was
discussed involved Umbehent and a female "floor person" telling
plaintiff that she could "move up" if she remained on the second
processing shift.[7]  Even so, that statement involved no request for
sexual favors or submission to sexual advances as a prerequisite to
"mov[ing] up."  Therefore, plaintiff has failed to establish a *prima
facie* case of *quid pro quo* sexual harassment.

---

[6]*See supra* note 3.

[7]*See supra* at 6-7.

14

## B.    Hostile Work Environment Sexual Harassment

To establish a *prima facie* case for hostile work environment
sexual harassment, a plaintiff must allege and prove five elements:
(1) plaintiff belongs to a protected group; (2) plaintiff was
subjected to unwelcome sexual harassment; (3) the harassment
complained of was based upon plaintiff's sex; (4) the harassment
complained of affected a "term, condition, or privilege" of
employment, in that it was "sufficiently severe or pervasive to
alter the condition of [the victim's] employment and create an
abusive working environment"; and (5) the employer knew, or should
have known of the harassment, but failed to take prompt remedial
action and, therefore, is liable under principles of *respondeat
superior*.[6]  *Henson*, 682 F.2d at 903-905; *Martin v. Norfolk Southern
Railway Company*, 926 F. Supp. 1044, 1050 (N.D. Ala. 1996).

Defendant does not dispute that plaintiff can establish the
first three elements of her *prima facie* case.  Instead, defendant
contends that: the harassment was not sufficiently severe or
pervasive to unreasonably interfere with plaintiff's job
performance; and, even if a hostile work environment were
established, defendant took prompt remedial action and, therefore,
is not liable under the doctrine of *respondeat superior*.

---

[6] Unlike *quid pro quo* harassment, satisfying the first four elements of the
*prima facie* case does not establish strict liability.  In hostile environment
cases, liability attaches, if it attaches at all, through the doctrine of
*respondeat superior*.  *See* Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311,
1316 (11th Cir. 1989).

15

## 1.   Sufficiently severe or pervasive conduct

Plaintiff must demonstrate that the conduct complained of was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. *Meritor Savings Bank v. Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (1986)(quoting *Henson v. City of Dundee,* 682 F.2d 897, 903-04 (11th Cir. 1982)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370.

In evaluating whether harassment is sufficiently severe or pervasive to bring it within Title VII's purview, the court must examine the totality of circumstances, including: "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and, whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

Plaintiff's allegations of sexual harassment are based on the following conduct of Umbehent: (1) calling plaintiff in the office to "talk about nothing"; (2) giving plaintiff favorable treatment during absenteeism counseling; (3) asking plaintiff if her "husband [gave her] any last night"; (4) massaging her shoulders on two occasions; (5) commenting about her "big and pretty" legs; (6) remarking that plaintiff's "passion mark" left the appearance that

16

"someone tried to eat [her] up"; (7) placing his hand on plaintiff's leg during an attendance counseling session; (8) frequent touching of plaintiff's arm in the cafeteria; and (9) treating plaintiff as his "personal secretary." Plaintiff alleges the harassment began in April 1994; she left her position at Tyson Foods in October 1994. Accordingly, the offending events occurred over a period of approximately six months.

Considered individually, the severity of each incident does not rise to the level necessary to establish a hostile work environment. *See Weiss v. Coca-Cola Bottling Company of Chicago,* 990 F.2d 333, 337 (7th Cir. 1993)(isolated incidences of non-severe conduct do not a hostile environment make). Considered in combination, however, they do. The incidents occurred continuously and consistently over a period of approximately six months. The frequency of Umbehent's conduct was more than just episodic. Further, although Umbehent's comments were not physically threatening, plaintiff testified that they were humiliating. In addition, the comments about plaintiff's legs, the constant "touchings", and inquiries into relations with her husband certainly were intrusive. Therefore, this court concludes that a reasonable jury could find Umbehent's comments and unwanted touchings sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment.

    2.   **Prompt remedial action**

Even when, as here, the offending conduct is determined to be sufficiently sever or pervasive, summary judgment still may be

17

appropriate in a hostile work environment case, if defendant demonstrates the harassment was met with prompt remedial action. Strict liability does not attach in a hostile work environment case.

> Strict liability is illogical in a pure hostile environment setting. In a hostile environment case, no *quid pro quo* exists. The supervisor does not act as the company; the supervisor acts outside "the scope of actual or apparent authority to hire, fire, discipline, or promote." Corporate liability, therefore, exists only through *respondeat superior*; liability exists where the corporate defendant knew or should have known of the harassment and failed to take prompt remedial action against the supervisor.

*Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir. 1989), 867 F.2d at 1316 (citing *Henson,* 682 F.2d at 905; *Bundy v. Jackson,* 641 F.2d 934, 943 n.8 (D.C. Cir. 1981)).

The employer's response must be prompt and "reasonably calculated to end the harassment." *Garcia v. Elf Atochem,* 28 F.3d 446, 451 (5th Cir. 1994); *Brooms v. Regal Tube Company,* 881 F.2d 412, 420 (7th Cir. 1989). Title VII requires the employer to do more than merely request that the offending employee refrain from discriminatory conduct in the future. *DeGrace v. Rumsfeld,* 614 F.2d 796, 805 n.5 (1st Cir. 1980). Even so, "Title VII does not require an employer to use the most serious sanction available to punish the offender." *Landgraf v. USI Film Products,* 968 F.2d 427, 430 (5th Cir. 1992), *aff'd,* 511 U.S. 244, 144 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Thus, Tyson Foods was not required to terminate Umbehent in response to plaintiff's allegations of harassment. *See Barrett v. Omaha National Bank,* 726 F.2d 424, 427 (8th Cir. 1984).

18

An instructive case is *Klutch v. Nevada Landing Partnership*, 1996 WL 465393 (N.D. Ill. 1996), where the day after plaintiff filed a formal complaint with her employer, the alleged harasser was suspended for three days and an investigation was initiated. In addition, a written warning was placed in the alleged harasser's employment file directing him to refrain from discriminatory conduct and advising him that any further complaints regarding sexual harassment would result in immediate termination. *Klutch*, 1996 WL 465393, at *3. The court concluded: "because defendant's actions were prompt and designed to [end] the harassing behavior, defendant cannot be held liable for [the supervisor's] conduct." *Klutch*, 1996 WL 465393, at *3 (citing *Baskerville v. Culligan International Co.*, 50 F.3d 428, 432 (7th Cir. 1995)).

Similarly, in *Clark v. Johnson Controls World Services, Inc.*, 939 F. Supp. 884 (S.D. Ga. 1996), the employer did not contest the first four elements of plaintiff's prima facie case; rather, it argued that prompt remedial action was taken, thereby preventing it from being held liable for plaintiff's hostile work environment claim. In addressing defendant's response to the allegations of harassment, Judge Anthony Alaimo wrote:

> It is difficult for the Court to imagine a quicker or more prompt response to a harassment complaint than the actions taken by World Services in the case at bar. Clark first complained about sexual harassment on March 11, 1994. Jacobs was immediately suspended while an investigation was conducted. At the conclusion of the investigation, Jacobs was transferred to another position where he would not come into contact with Clark.

19

*Clark,* 939 F. Supp. at 890.  Judge Alaimo "conclud[ed] that World Services took prompt remedial action to resolve the sexual harassment complaint Clark asserted." *Clark,* 939 F. Supp. at 890.

This court finds *Klutch* and *Clark* persuasive.  In like manner, when Soretta Williams formally complained to Tyson Foods management in this case, Umbehent was immediately suspended for three days and an investigation was initiated.  A written reprimand was placed in his personnel file five days later. *See Waymire v. Harris County, Texas,* 86 F.3d 424, 429 (5th Cir. 1996)(written reprimand placed in employee's file was prompt remedial measure, "even with the three month delay").  That letter (signed by Ray Umbehent, Art Lankford, and Steve Snyder[9]) memorialized additional disciplinary action by defendant:

> After concluding the investigation it has been decided that the three (3) day suspension will stand as the disciplinary action for this case.  To avoid any further problems Ray [Umbehent] will be moved to second shift as the Sanitation Supervisor.
>
> Ray is notified that he is not to touch any Team Member in any manner.  Ray is also notified that he is not to discuss Team Members [sic] body parts, or matters of an intimate, or sexual nature.  Any of these actions, on the part of Ray, will be considered harassment.  If Ray is found to be harassing any Team Member, in any way, his employment with Tyson Foods, Inc. will be terminated.

(Defendant's Evidence Submitted in Response to Exhibit D of the Court's Order: Exhibit C to Wilson Affidavit.)  Umbehent never spoke to, or touched plaintiff after that disciplinary action was taken.  (Plaintiff's Deposition, at 60.)  This court concludes the

---

[9]The record does not reveal Steve Snyder's position at Tyson Foods or his role in the Team Member complaint process.

20

alleged harassment was met with prompt remedial action that was reasonably calculated to end the harassment. Therefore, defendant is not liable for Umbehent's conduct under the doctrine of *respondeat superior*.

### V. CONSTRUCTIVE DISCHARGE

Absent proof of underlying sexual harassment, there can be no constructive discharge predicated on the harassing conduct. *Barrett v. Omaha National Bank,* 726 F.2d 424, 428 (8th Cir. 1984)("[h]aving failed to prove her claims of sexual harassment ... Barrett has not established the underlying illegality necessary to support a constructive discharge claim"); *Vermett v. Hough,* 627 F. Supp. 587, 607-08, (W.D. Mich. 1986)(claim of constructive discharge "must of necessity fail" if there is no finding of sexual harassment); B. Lindemann and D. Kaude, *Sexual Harassment in Employment Law,* 255 n.11 (1995)(if the plaintiff fails to prove the underlying sexual harassment, there can be no claim of constructive discharge predicated on the harassing conduct). Accordingly, plaintiff's claim of constructive discharge must fail.

### VI. CONCLUSION

An order consistent with this memorandum opinion will issue contemporaneously herewith.

DONE this 29th day of April, 1997.

United States District Judge

21